**In re WESTIN CAPITAL MARKETS, INC., Debtor.**

No. 692–62389–psh7.

United States Bankruptcy Court, D. Oregon.

June 30, 1995.

Donald R. Slayton, Eugene, OR, for debtor.

Wilson Muhlheim, R. Scott Palmer, Carolyn G. Wade, Eugene, OR, for Davidson.

Stephen E. Blackman, David J. Sweeney, Portland, OR, for creditors, movants.

## MEMORANDUM OPINION

POLLY S. HIGDON, Bankruptcy Judge.

The Chapter 7 involuntary petitioning creditors have filed a motion for sanctions under Bankruptcy Rule 9011, 28 U.S.C. § 1927 and 28 U.S.C. § 1912. The motion is directed at several attorneys and a client.

### I. BACKGROUND

The original petitioners, Harold and Donna Markuson and Jeffrey Schultz, filed an involuntary Chapter 7 petition against Westin Capital Markets, Inc. ("the corporation" or "Westin") on May 29, 1992. One of the reasons for the involuntary filing was to attempt to avoid an alleged transfer of $150,-000 from the alleged debtor to a Mr. Davidson within one year of the filing. Mr. Davidson believed that the corporation did not owe a debt to the Markusons. He believed this debt was owed individually by the corporation's founder, majority shareholder, and president, Mr. Joel Austin, who had left active involvement with Westin in 1991 and was then in prison for crimes arising out of the operation of its business, including his use of funds entrusted to him by the Markusons. Mr. Davidson also questioned whether Westin owed any debt to Mr. Schultz. Under 11 U.S.C. § 303(b), only a creditor whose claim is not subject to a bona fide dispute can file an involuntary petition. If the Markusons' and Schultz's claims were not bona fide undisputed claims, the petition should not have been filed. Mr. Austin, however, refused to contest the filing of the involuntary petition on behalf of the corporation.

In their involuntary petition the petitioners, knowing that Mr. Austin was in prison, pursuant to the requirement of LBR 1003–2(b), named Mr. Davidson as the person who should be designated to perform the duties of the debtor if relief were ordered. On June 29, 1992 Mr. Donald Slayton, after consulting with Mr. Davidson, filed an Answer and Objection to the Petition ostensibly on behalf of the alleged debtor. Further, on December 22, 1992 he filed a motion to dismiss the involuntary petition. The petitioners responded by filing, *inter alia,* a motion to strike the answer, asserting that Mr. Davidson did not have authority to file an answer on behalf of the alleged debtor.

After trial on January 4, 1993 this court found Mr. Davidson was neither a director nor a stockholder of the alleged debtor but only an employee. When he filed the answer he did so in what he alleged was his capacity as Vice–President. There was no meeting of the Board of Directors of the corporation held to authorize such a filing. The court granted the petitioners' motion and entered an order of relief. This order was appealed and affirmed by the district court.

Petitioners have advanced several grounds for requesting sanctions. The first is that Davidson had no authority to represent the corporation. They allege that he and his attorneys could not in good faith have concluded that he did because an adequate investigation would have indicated Davidson's lack of authority. They claim Mr. Davidson and his attorneys imposed "unjustified burdens" on the proceedings, including demanding that petitioners file a bond, filing a dilatory response to petitioners' request for production of documents, and making unnecessary requests for personal depositions of several of the petitioning creditors. They allege that Davidson and his counsel demonstrated bad faith in objecting to the claims of other creditors, including those whose names they themselves had supplied to the original petitioners, the Markusons. They further allege that Davidson and his attorneys demonstrated an "economy of truth" in selectively editing documents referred to in a legal memorandum, that they failed to notify either of the ruling courts that an affidavit (the "Ei-senkramer affidavit") used in their pleadings had never been signed, and that they produced documents at a late date after previously telling petitioners that no further documents could be found. They also allege that the appeal was taken in bad faith for the purpose of delay because it included "phantom issues" but no substantive ones, and that the law was so clear that there was no non-frivolous basis for an appeal.

The court finds the following with regard to the role of each person against whom sanctions are sought.

*Mr. Wilson Muhlheim:*

Mr. Wilson Muhlheim, Mr. Scott Palmer and Ms. Carolyn Wade are members of the same law firm. Mr. Davidson originally sought Mr. Muhlheim's advice. Mr. Muhlheim declined to represent the corporation but agreed to represent Mr. Davidson individually. He referred Mr. Davidson to Mr. Slayton for possible representation of the alleged debtor corporation. Mr. Muhlheim did not act formally in the case until November 9, 1992 when, on behalf of Mr. Davidson, he filed a Memorandum in Response to the petitioning creditors' Motion for Protective Order and appeared at the hearing on that motion. He also appeared at the January 4, 1993 hearing on the motion to dismiss and motion to strike solely to address any issues on sanctions against Mr. Davidson which might arise.

At the hearing on the sanctions motion, Mr. Muhlheim stated that he "got back into" the case after the bankruptcy court's ruling that Mr. Davidson lacked the necessary authority to contest the petition. He decided to appeal. His name and Mr. Palmer's name, as attorneys for Mr. Davidson, were on the following documents, although the documents were signed only by Mr. Palmer: the Notice of Appeal filed April 2, 1993, the Designation of Record and Issues on Appeal filed April 12, 1993, and the Motion to Extend Time to File Brief filed May 28, 1993. Mr. Slayton's name was also on the documents as the attorney for the alleged debtor. Mr. Muhlheim's firm's name was on the appeal brief as attorneys for Mr. Davidson along with Mr. Slayton's name as the attorney for Westin although the brief was only

signed by Ms. Wade. After affirmance on appeal Mr. Muhlheim, on behalf of the alleged debtor, then filed an application for his employment as special counsel for the alleged debtor with regard to the debtor's claim against Gulf Insurance Company on a securities dealer blanket bond. He later withdrew this application. On April 20, 1993, Mr. Muhlheim appeared on behalf of Mr. Davidson at a hearing on the bankruptcy court's order to show cause why the case should not be dismissed for failure to file schedules. On July 27, 1994, he filed a Motion to Extend Time for Filing Response to Request for Hearing on Motion for Sanctions, and on August 3, 1994, he appeared at a telephone hearing on this motion. On August 5, 1994, he filed the response.

*Mr. Donald Slayton:*

Mr. Scott Palmer contacted Mr. Slayton about representing the alleged corporate debtor. In bankruptcy court Mr. Slayton made numerous appearances and filed numerous pleadings on behalf of the corporation. He testified that he had shared in the decision to appeal the bankruptcy court's adverse ruling. The record indicates he played an active role in pursuing the appeal.

*Mr. Richard Davidson:*

In his December 15, 1992 deposition [1] Mr. Davidson stated that he was "general principal" and "options principal" of Westin, acting in the capacity of office manager. He had been told by Mr. Austin that he was a 2% shareholder although he had never received any stock certificates. Mr. Austin had provided him with business cards and an engraved name plate designating him as a vice president and had so referred to him in the corporation's application to the National Association of Securities Dealers ("NASD"). There had never been any formal election of directors, although there were minutes of what purported to be board of directors meetings at which Mr. Austin, Mr. Davidson,

and others were present.[2] In an affidavit filed with the court he stated that Mr. Austin, not himself, handled Westin's books and records.

At his deposition Mr. Davidson said that he had become aware of irregularities in Mr. Austin's financial affairs in March, 1991. On March 27, 1991, a NASD official came to Westin's office and informed Davidson and the other employees about a "secret" Westin account at the aptly-named Valley of the Rogue Bank that none of the employees had known of. When confronted with this knowledge, Mr. Austin refused to disclose the source of the funds in this account and refused to resign. Mr. Davidson and the other employees decided to fire him. They then checked on the status of the regular Westin account at the Bank of Southern Oregon, and learned that the corporation's $150,000 CD, held there in compliance with certain securities licensing requirements, had been encumbered with a promissory note by Mr. Austin in violation of these requirements. On April 15, Mr. Davidson was told by Mr. Austin and Mr. Austin's attorney, who was also referred to as the corporation's attorney, that he had no right to fire Austin, and that if he didn't do what Mr. Austin required "he was going to shut us down." Mr. Davidson then signed a Memorandum of Understanding, under which he agreed personally to supply $150,-000 to satisfy the licensing requirements and Mr. Austin agreed to resign as officer and director of the corporation and transfer to the other corporate employees/shareholders all of his Westin stock. However, this Memorandum never became effective because its terms were subject to an independent audit which was never completed. Mr. Davidson deposited $150,000 to the Westin account at the Bank of Southern Oregon which he acquired by borrowing from his sister-in-law. There is conflicting evidence as to how the encumbrance on the $150,000 was removed, but it is clear that the $150,000 Mr. Davidson

1. Mr. Davidson's deposition was tendered without objection at the hearing on the Motion for Sanctions, but this court inadvertently omitted to designate it as a part of the record. See transcript of sanctions hearing pp. 48–49. The court hereby remedies that omission.

2. These minutes were initially filed on January 21, 1993 as Exhibit 1 to the alleged debtor's Supplemental Memorandum in Opposition to Motion to Strike Answer and Motion for Default, although they were objected to by petitioners. They were accepted by the court as respondents' Exhibit R at the Sanctions Hearing.

deposited was used to satisfy the securities requirement that there be an unencumbered $150,000 deposit. Acting on the advice of counsel, Mr. Davidson and the other employees then decided to close down Westin's operations. On May 30, 1991, the last day of operations, Mr. Davidson caused the corporation's $150,000 CD to be redeemed and a cashier's check to be issued to the corporation from the Bank of Southern Oregon for $150,000, plus interest. He then caused a $150,000 check from the corporation to him and a cashier's check from him to his sister-in-law to be issued for the same amount.

Mr. Davidson and the other employees first learned of the Markusons on May 7, 1991 when Mr. Markuson appeared at the corporation's office and inquired about his account. Mr. Austin learned later that day that the Markusons had gone to Westin's office, and he disappeared. Mr. Davidson and the other employees continued for a time to meet and talk with the Markusons and with other securities and government officials about the Markusons' funds and the corporation's situation.

After the bankruptcy petition was filed, Mr. Austin signed an affidavit denying that Mr. Davidson had the authority to represent the corporation, and ordering him to cease contesting the filing. After the court entered the order of relief it ordered Mr. Davidson to perform certain duties for the debtor, including filing the bankruptcy schedules and statement of affairs. Mr. Austin at that time was in prison. By court order on September 28, 1993, Mr. Austin, who had recently been released, was substituted for Mr. Davidson.

*Mr. Scott Palmer:*

After Mr. Muhlheim talked to Mr. Davidson he discussed the case with Mr. Palmer as part of their team practice and asked him to assist in retaining counsel to represent the corporation. After learning something about the prebankruptcy history of the debtor and its business he, like Mr. Muhlheim, believed that neither Mr. Schultz nor the Markusons had claims against the debtor. He formed an opinion that Mr. Davidson could represent the corporation for purposes of objecting to the petition. He played the role of "sounding board" in the firm until the appeal of this court's substantive ruling. He had no ongoing responsibilities for preparing or filing documents or doing research. Throughout the case he talked to Mr. Davidson. He testified that he did not do an independent assessment of whether or not Mr. Davidson could appropriately represent the debtor but primarily relied on Mr. Muhlheim's assessment. He prepared the notice of appeal and designation of record and issues on appeal and signed both on behalf of Mr. Davidson. He also filed a motion for extension of time to file an appeal brief, and a response to the motion to dismiss the appeal on behalf of Davidson and Westin.

*Ms. Carolyn Wade:*

Ms. Wade first became involved in this case after the notice of appeal and designation of record and issues on appeal had been filed. She reviewed the pleadings, correspondence, and notes that the firm had created; she spoke with Mr. Palmer, Mr. Muhlheim and Mr. Slayton. She conducted research. She prepared the brief and excerpt of record. She testified that when preparing the brief and excerpt she noted that the Eisenkramer affidavit had never been signed; knowing this she did not rely on it in preparing her brief. She did not notify the appeal court that the affidavit had not been signed and was not now a part of the record on appeal.

## II. DISCUSSION OF LAW

The court's first task is to determine whether it has the authority to impose sanctions against any of these persons under one or more of the provisions of 28 U.S.C. §§ 1912, 1927, or Bankruptcy Rule 9011. If it finds it does have the authority to impose sanctions, the court must then determine the scope of that authority. Finally, the court must determine whether the facts warrant imposition of sanctions.

### *28 U.S.C. § 1912*

■ Section 1912 states:

"Where a judgment is affirmed by the Supreme Court or a court of appeals, the court in its discretion may adjudge to the prevailing party just damages for his delay, and single or double costs."

This statute allows "the court" to impose sanctions if a judgment is affirmed on appeal. This rule is similar to Fed.R.App.P. 38, which provides:

"If a court of appeals shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee."

The question, however, is whether "the court," as used in § 1912, refers only to the Supreme Court and court of appeals, or other court functioning in an appellate capacity, or if it includes a trial court hearing a motion requesting sanctions for an appeal. Under the holdings of the Ninth Circuit and other courts, it appears that § 1912 does not grant a bankruptcy court authority to award sanctions for an appeal.

In *In re Vasseli* 5 F.3d 351 (9th Cir.1993) the Ninth Circuit, without specifically addressing the trial court's authority under 28 U.S.C. § 1912, concluded that a bankruptcy court lacked the authority to impose sanctions for a frivolous appeal. In holding that the bankruptcy court did not have the authority under Fed.R.App.P. 38 to award fees incurred on appeal, the Ninth Circuit stated:

The BAP held that Rule 38 empowers only appellate courts, not bankruptcy courts to award damages, attorney's fees, and other expenses incurred by an appellee in response to a frivolous appeal. The BAP used Rule 38 to demonstrate that although an appeal court has the authority to award fees for appellate representation, it does not have the authority to delegate this power to the bankruptcy court. We agree.... Under Rule 38 any fee request for attorney's fees incurred by a prevailing party must be made to the appellate court.

*Id.* at 353, 354.

Courts in other jurisdictions have reached similar conclusions. *In re Emergency Beacon Corporation,* 790 F.2d 285 (2d Cir.1986) (bankruptcy court's "equitable jurisdiction" does not confer authority to award fees for

an appeal; relief should be sought from appellate court under Rule 38 or Fed.R.Civ.P. 11); *In re DN Associates,* 165 B.R. 344 (Bankr.D.Maine 1994) (bankruptcy court can't award sanctions for frivolous appeal, but appellate court can award sanctions under Rule 38).[3]

Although the *Vasseli* opinion is not directly on point, this court believes that the similarity of language between § 1912 and Rule 38 makes the Ninth Circuit's holding in *Vasseli* applicable to this situation. Both provisions refer to a "court of appeals" and provide for the same form of damages. Accordingly, this court concludes it has no authority to award sanctions under § 1912.

### 28 U.S.C. § 1927

■ The claimants also seek the imposition of sanctions under 28 U.S.C. § 1927. This section states:

"Any attorney or other person admitted to conduct cases in *any court of the United States* or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorney's fees reasonably incurred because of such conduct." (Emphasis added).

Previously bankruptcy courts within the Ninth Circuit have awarded sanctions under § 1927, which have been upheld on appeal with no discussion of the bankruptcy courts' authority to do so. *See In re Peoro,* 793 F.2d 1048 (9th Cir.1986) (affirming bankruptcy and district courts' award of § 1927 sanctions); *cf. In re Chisum,* 68 B.R. 471 (9th Cir. BAP 1986), *aff'd on other grounds* 847 F.2d 597 (9th Cir.), *cert. denied* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988) (the bankruptcy appellate panel agreed with the bankruptcy court's decision on the merits not to award § 1927 sanctions but agreed it had the authority to award such sanctions). However, a 1992 Ninth Circuit opinion strongly suggests that a bankruptcy court

---

**3.** There is a split of authority as to whether district courts acting as appellate courts can award fees under Rule 38 for improper appeals. *Compare In re Grosse,* 96 B.R. 29 (E.D.Pa.), *aff'd,* 879 F.2d 857 (3d Cir.), *cert. den.,* 493 U.S. 976, 110 S.Ct. 501, 107 L.Ed.2d 504 (1989) (only

circuit courts have authority to impose Rule 38 sanctions) *with In re DN Associates,* 165 B.R. 344, 350 (Bankr.D.Maine 1994) ("neither the district court or the court of appeals imposed sanctions ... as they might have done under [Rule 38 or Fed.R.Civ.P. 11]").

lacks the authority to impose sanctions under § 1927 because it is not a "court of the United States." In *In re Perroton*, 958 F.2d 889 (9th Cir.1992), the circuit court held that the bankruptcy court lacked the authority to waive filing fees given to "[a]ny court of the United States" by 28 U.S.C. § 1915(a). The court noted that the definition of "court of the United States" for all of Title 28 of the United States Code is contained in 28 U.S.C. § 451, which states in relevant part:

As used in this title:

The term "court of the United States" includes the Supreme Court of the United States, courts of appeals, district courts constituted by chapter 5 of this title, including the Court of International Trade and any court created by Act of Congress the judges of which are entitled to hold office during good behavior.

The court said it was unclear from the plain language of § 451 what Congress meant by courts "the judges of which are entitled to hold office during good behavior." It concluded that this was a term of art mirroring the language of Article III of the Constitution, which provides for life tenure of Article III judges. Therefore, Congress must have intended in § 451 to refer to Article III courts. Bankruptcy courts are Article I courts. *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The court found further support for its conclusion in the legislative history of § 451. In the 1978 Bankruptcy Reform Act Congress initially amended § 451 to explicitly include bankruptcy courts, but then deleted this addition in a subsequent amendment. Therefore, the court reasoned, Congress must not have intended to include bankruptcy courts within the definition in § 451.

Section 1927, like § 1915, is a part of Title 28 of the U.S.Code. Applying the reasoning in *Perroton*, therefore, the phrase "court of the United States" in § 1927 must not include a bankruptcy court. A similar conclusion was reached by the Tenth Circuit in *In re Courtesy Inns, Ltd., Inc.*, 40 F.3d 1084 (10th Cir.1994), which relied upon the reasoning in *Perroton* to find that bankruptcy courts could not award § 1927 sanctions.

The *Perroton* holding has been criticized in some other jurisdictions but no subsequent controlling authority has overruled it or held it inapplicable to cases involving § 1927 sanctions. *Cf. In re Cascade Roads*, 34 F.3d 756 (9th Cir.1994) (expressing no opinion on whether a bankruptcy court was a "court of the United States" under the Equal Access to Justice Act, 28 U.S.C. § 2412, because the district court, not the bankruptcy court, invoked the statute; did not cite *Perroton* ); *In re Germaine*, 152 B.R. 619 (9th Cir. BAP 1993) (upheld the bankruptcy court's authority to award fees under 26 U.S.C. § 7430; distinguished *Perroton* as being decided under Title 28, which had a different definitional section). Accordingly, this court concludes that it lacks the authority to impose sanctions under § 1927.

### Fed.R.Bank.P. 9011

Fed.R.Bankr.P. 9011 states, in relevant part,

The signature of an attorney or a party [on a pleading, motion or other paper served or filed] constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information or belief formed after reasonable inquiry, it is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation or administration of the case.

\* \* \* \* \* \*

If a document is signed in violation of this rule, the court on motion or on its own initiative, shall impose on the person who signed it, the represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including a reasonable attorney's fee.

This rule authorizes sanctions against a party and/or his attorney in connection with the filing or serving of pleadings or

other documents. A bankruptcy court has the authority to impose such sanctions for activities at the trial level. *In re Chisum,* 847 F.2d 597, 599 (9th Cir.), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988). There is a question as to whether this court may impose Rule 9011 sanctions for an improper appeal to the district court. The Supreme Court held that Fed.R.Civ.P. 11, which has language similar to Rule 9011, does not authorize a district court sitting as the trial court to award attorneys' fees incurred on appeal. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). The Court rejected the argument that the language "expenses incurred because of the filing" extended to expenses incurred because of the appeal. It is clear that the district court may award sanctions for an appeal from the bankruptcy court. *Hedges v. Resolution Trust Corp.,* 32 F.3d 1360 (9th Cir.1994), *cert. denied* — U.S. ——, 115 S.Ct. 1792, 131 L.Ed.2d 721 (1995). In so holding, the *Hedges* court noted that the word "court" in Rule 9011 is defined in Fed.R.Bankr.P. 9001(4) as "the judicial officer before whom a case or proceeding is pending." Rule 9011(a) states in part that if a document is signed in violation of this rule, the court may impose a sanction including an order to pay "the reasonable expenses incurred because of the filing of *the document*" (emphasis added). Thus it appears that the proper court to impose sanctions for filing an appeal is the court hearing the appeal. Accordingly, this court concludes that it may award sanctions under Rule 9011 only for conduct occurring prior to the appeal.

▆▆▆ Cases interpreting Rule 9011 have applied a two-prong test: was the filing "well-grounded in fact" and warranted by existing law or a good faith argument for changing the law—that is, was it "frivolous"—and was it motivated by an "improper purpose"? Frivolousness is "a shorthand that this court has used to denote a filing that is both baseless and made without a reasonable and competent inquiry." *Townsend v. Holman Consulting Corp.,* 929 F.2d 1358, 1362 (9th Cir.1990) (Rule 11). A pleading is frivolous if, after reasonable inquiry, the pleader "could not form a reasonable

belief that the petition is well grounded in fact and warranted by existing law or a good faith argument for the modification or reversal of existing law." *In re Rainbow Magazine, Inc.,* 136 B.R. 545, 551 (9th Cir. BAP 1992). This test creates an affirmative duty of investigation as to both the law and facts before filing. *Golden Eagle Distributing Corp. v. Burroughs Corp.,* 801 F.2d 1531, 1536 (9th Cir.1986). A reasonable inquiry is an inquiry reasonable under all the circumstances of a case. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). The Rule itself gives examples of an "improper purpose": "such as to harass or to cause unnecessary delay or needless increase" in costs. Harassment "must do more than in fact bother, annoy or vex the complaining party" *Zaldivar v. City of Los Angeles,* 780 F.2d 823, 831–832 (9th Cir.1986). Successive complaints based upon propositions of law previously rejected may constitute harassment. *Id.* at 832. Other purposes besides those specifically enumerated in the Rule may also be deemed improper. *See In re Marsch,* 36 F.3d 825 (9th Cir.1994) (to delay collection of judgment and avoid posting appeal bond); *Townsend v. Holman Consulting Corp., supra* (naming attorney as defendant who had opposed plaintiff's attorney in related state court action was "essentially vindictive"); *In re Rainbow Magazine, Inc., supra* (bankruptcy petition filed in bad faith when debtor's principal had engaged in self-dealing and had diverted assets from the estate and from secured creditor).

▆▆▆ Under both prongs the court must judge the conduct in light of the circumstances then facing the alleged violator but the court applies an objective standard to those circumstances. *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991). If the conduct is not reasonable, sanctions will be imposed even if the filing was not in subjective bad faith. *Zaldivar v. City of Los Angeles, supra.* The Ninth Circuit in *Townsend* has cited with approval a Second Circuit opinion emphasizing

that whether a pleading is sanctionable must be based on an assessment of the

knowledge that reasonably could have been acquired at the time the pleading was filed; that it must be based on an assessment of the type of claim and the difficulty of acquiring sufficient information; that it must be based on an assessment of which party has access to the relevant facts; and that it must be based on an assessment of the significance of the claim in the pleading as a whole.

929 F.2d at 1364, citing *Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir.1986). Therefore,

> if a lawyer discovers that his client has a potential cause of action only a short time before the statute of limitations will expire, a more cursory inquiry will be tolerated than when he has ample time to investigate ... If the relevant facts are in control of the opposing party, more leeway must be given to make allegations in the early stages of litigation that may not be well-grounded.

929 F.2d at 1364. In *Townsend*, the court found the filing of an amended complaint to be unreasonable when the party had conducted "absolutely no inquiry" before filing it.

In all jurisdictions except the Ninth Circuit, courts have held that sanctions are applicable under the virtually identical language in Fed.R.Civ.P. 11 when either frivolousness or improper purpose is found. However, the Ninth Circuit has held that if a *complaint* is not filed frivolously, it cannot be deemed filed for an improper purpose. *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358 (9th Cir.1990) (en banc)). In *In re Marsch*, 36 F.3d 825 (9th Cir.1994), the Bankruptcy Appellate Panel followed *Townsend* in determining that sanctions could not be applied under BR 9011 for filing a bankruptcy petition if the petition were not filed frivolously although filed clearly for an improper purpose. In reversing the Bankruptcy Appellate Panel, the Ninth Circuit departed from *Townsend* in interpreting Rule 9011. The Ninth Circuit said it agreed with *Townsend*'s "basic teaching, which is that frivolousness and improper purpose are not wholly independent considerations but 'will often overlap,'" *id.*, citing 929 F.2d at 1362, but held:

> We conclude that bankruptcy courts must consider both frivolousness and improper purpose on a sliding scale, where the more compelling the showing as to one element, the less decisive need be the showing as to the other.

36 F.3d at 830. This court accordingly must examine respondents' trial conduct for both frivolousness and improper purpose on a sliding scale.

### III. APPLICATION OF BANKRUPTCY RULE 9011 TO ATTORNEYS' AND DAVIDSON'S CONDUCT

Because the only remaining basis for the court to award sanctions is B.R. 9011, which does not apply to conduct on appeal, only the parties' actions prior to the appeal will be considered.

*Mr. Slayton:*

The petitioners request sanctions against Mr. Slayton on a number of bases. Their primary argument is that Mr. Slayton's representation of the corporation at Mr. Davidson's request through various filings was both frivolous and undertaken for an improper purpose because Mr. Davidson clearly did not have authority to file an answer on the corporation's behalf. Whether such conduct was sanctionable turns on whether Mr. Slayton conducted an adequate investigation under the circumstances into the bona fides of the creditors' claims and Mr. Davidson's authority to answer the involuntary petition, and whether the facts determined by this investigation warranted a good-faith legal argument for Mr. Davidson to challenge the involuntary petition.

The record indicates that Mr. Davidson contacted Mr. Muhlheim after the involuntary petition was filed. Mr. Muhlheim referred him to Mr. Slayton for representation of the corporation, and informed Mr. Slayton of the results of his initial investigation and his legal conclusion that Mr. Davidson had authority to answer the petition. Mr. Muhlheim had asked Mr. Davidson to bring with him all the corporate records and papers he had. He also talked with Mr. Davidson's attorney, Mr. Hornecker, and Mr. Hogan, Hornecker's partner, who had represented Davidson in a state court claim filed by the

Markusons against Westin and its employees. Among the documents brought by Mr. Davidson were an October 1990 audited financial statement that did not indicate any corporate debt owed to the Markusons, although the Markusons had by that time transferred over $200,000 to Mr. Austin. The statement also listed Mr. Davidson as a shareholder. The accuracy of this audit has not been challenged by petitioners. The documents indicated that any trades made for Mr. Schultz by Mr. Austin for which any balance might be owing involved another entity than Westin. They also indicated that Mr. Davidson was represented on the NASD broker dealer application, on his business cards, and on an American Express card as a vice president of Westin. The involuntary petition was served upon Mr. Davidson as a vice president. Mr. Muhlheim said he also reviewed some informal minutes of what appeared to be board of directors meetings, at which Mr. Davidson and Mr. Austin were both present, although he could find no documentation indicating directors had ever been officially elected. Mr. Muhlheim said he knew at the time of his interview with Mr. Davidson that Mr. Austin had been convicted of stealing the Markusons' money. He also knew of Mr. Davidson's withdrawal of $150,-000 from Westin. Mr. Muhlheim testified that he did extensive research on who in a corporation has the authority to initiate or defend bankruptcy petitions, and consulted two experienced corporate attorneys on this question. Based on this research and advice he believed Mr. Davidson had the authority under the circumstances to answer the petition, and he so advised Mr. Davidson and Mr. Slayton.

When Mr. Davidson came to see Mr. Slayton about representing the corporation he told Mr. Slayton that he was a vice president. Mr. Slayton reviewed some documents, including a financial statement that listed Mr. Davidson as a shareholder. He spoke with two other employees, Shirley Olson and Cathy Dorsey. Ms. Dorsey indicated that she also thought she was a shareholder. Ms. Dorsey, Ms. Olson, and Mr. Davidson all told him that the Markusons had never appeared on any corporate records as having conducted transactions with the corporation and that

there were no records of any debts owed to the Markusons. Mr. Slayton also familiarized himself with the facts of Mr. Austin's conduct regarding the corporation. Mr. Slayton did legal research on the requirements of filing involuntary petitions, including the number, bona fides, and undisputed nature of creditors' claims, and the right to request a bond. He concluded that the petition was improper because there were not a sufficient number of bona fide undisputed claims. He also concluded that Mr. Davidson had the authority, under the circumstances, to contest the petition.

 In determining whether the filing of the answer was frivolous or done for an improper purpose among the many factors this court must consider is any time limits in which a pleading must be filed. *See In re Carraher*, 971 F.2d 327, 328 (9th Cir.1992). The affairs of the corporation were confused and Mr. Slayton had only 20 days within which to file the answer. Failure to file would have been dispositive of the entry of an order of relief. The court concludes that given the circumstances, including the short time frame, the amount of investigation done regarding both Mr. Davidson's authority and the legitimacy of the claims against the corporation, and the legal conclusions formed by Mr. Slayton about Mr. Davidson's authority to contest the involuntary petition are sufficient to preclude an award of sanctions for filing the answer to the petition under Rule 9011. Although this court and the district court did not agree with Mr. Slayton's conclusions about Mr. Davidson's authority, failure to succeed on the merits is not *per se* grounds for sanctions under 9011.

 The record indicates that thereafter certain additional facts came to light. It is not always clear when these facts surfaced. As the movants have not provided the court with a sufficient record to allow the court to determine whether these facts were discovered before or after the filing of relevant pleadings, the court must assume that the pleadings were filed after the facts were discovered. These additional facts include the following: Mr. Davidson's understanding that he was a shareholder was reflected in the Mem-

orandum of Understanding between Mr. Austin and other employees, which listed Mr. Davidson as a shareholder. In both Mr. Eisenkramer's signed and unsigned affidavits he stated that Mr. Austin told him that Mr. Davidson and other employees were or would be officers and directors of Westin. In addition Mr. Austin had absented himself from the corporation, leaving Davidson and the others to run it prior to and during his incarceration. Mr. Austin filed an affidavit on December 22, 1992, six months after the answer to the petition was filed, denying Mr. Davidson's authority to contest the petition. Mr. Slayton said he chose not to believe Mr. Austin or to contact him because of his prior deceptive conduct and his desire to cooperate with the Markusons. In his sentencing hearing on June 18, 1992, Mr. Austin's attorney stated that Mr. Austin had "endeavored in every way he can" to assist the Markusons in recovering their money, and that he had accepted service of the involuntary bankruptcy petition. Although a purported election of officers was held on April 12, 1991 naming Mr. Richard Entinger as president after the employees attempted to oust Mr. Austin from the corporation there is no evidence that either Mr. Entinger or any other of the employees ever challenged Mr. Davidson's authority to defend against the petition or his decision to do so. Mr. Davidson stated that when the Markusons first realized that the funds they had transferred to Mr. Austin were unaccounted for Mr. Markuson had said that he would have to wait to get his money back from Mr. Austin when Mr. Austin returned. This statement was not challenged by petitioners.

 The court now turns to other pleadings which Mr. Slayton filed prior to the appeal. Once embarked upon his course of representing the corporation Mr. Slayton did so zealously. On October 20, 1992 he filed an objection to petitioners' motion to amend or supplement the petition on the ground that none of the original petitioners had bona fide undisputed claims and that the amount of certain added petitioners' claims did not meet statutory requirements. On December 30, 1992 he also filed a memorandum in opposition to petitioners' motion to strike and motion for default, on the ground that Mr.

Davidson had the authority to represent the corporation in the involuntary proceeding. With respect to his factual investigation, Mr. Slayton stated at the July 14, 1992 pretrial hearing held to identify the issues for trial that he wanted to take discovery of the three petitioning creditors (the Markusons and Mr. Schultz). The first indication in the record of this discovery is written interrogatories and requests for admission served on these three creditors on November 19, as well as other discovery served on the additional petitioning creditors on November 17. These discovery requests included requests for information from the Markusons as to whom they had given the funds in question, their intended purpose for these transfers, and what receipts they had for these transfers. Mr. Slayton also requested information from Mr. Schultz regarding all transactions brokered for him by Westin, and from other petitioning creditors regarding their claims against Westin. This followed the court's November 9 order granting petitioners' motion for a protective order against personal depositions. On December 22, 1992, Mr. Slayton filed a motion to dismiss/motion to strike the involuntary petition because of petitioners' alleged failure to cooperate with discovery. The record is incomplete regarding the responses to these discovery requests. Following Mr. Davidson's deposition on December 15, 1992, Mr. Slayton contacted the Chicago law firm which had handled the incorporation of Westin. The only documents he received from them (the record does not indicate when they were received) involved the initial set-up of the company in early 1990, before Mr. Davidson joined, and so provided little help in determining Mr. Davidson's subsequent position and authority in the firm. While this investigation may not have been exhaustive, the court does not find it so inadequate as to make the factual basis for the balance of pleadings filed after the answer frivolous. This is not the *Townsend* situation, where sanctions were awarded when the attorney failed to conduct any inquiry at all before filing an amended complaint.

 The court now must consider the merits of respondents' legal arguments that Davidson had the right to contest the invol-

untary petition on behalf of the corporation. There are two aspects to this legal conclusion: first, that the involuntary petition was improper; and second, that Davidson had the authority under the circumstances to contest it. With regard to the first element, in his answer and objection to the petition, Mr. Slayton asserted that the petitioning creditors did not constitute three or more holders of bona fide, undisputed claims; that there were more than twelve claim holders; and that there were no assets of the corporation left to administer because of Westin's cessation of business and involuntary dissolution by the Oregon Corporation Division in March 1992. This argument is supported by the 1990 audit which did not reveal any debt owed to the Markusons or Schultzes. In his objection to the motion for leave to file amended and supplemental petitions, Mr. Slayton also asserted that the aggregate claims of the new petitioners did not meet the statutorily required amount. (Mr. Muhlheim's memorandum in response to the motion for protective order also challenged the bona fides of the new petitioning creditors on the grounds that either no funds were owed to them or if there were funds owed, these were debts of Mr. Austin's other business entity, Westin Holdings Group.) Respondents' appellate brief similarly asserted that none of the three original, and only two of the supplemental petitioning creditors, had bona fide claims, and that these two claims totalled only $896.11 and were therefore de minimus. The fact that Mr. Davidson had supplied the names of these petitioners in response to petitioner's interrogatory did not preclude respondents from challenging their claims, because the interrogatory only asked him to "identify ... all persons or entities who *may* be creditors or holders of claims against Westin." (Emphasis added). The court concludes that there was a good faith basis for arguing that the petition was improper.

■ Second, Mr. Slayton needed to investigate whether under the facts and the law Mr. Davidson had the authority to contest the petition for the corporation. Corporate formalities were not properly followed. Mr. Slayton had no evidence of any official election of a board of directors or of officers, or of a formal authorization by a board of directors for Mr. Davidson to defend against the petition. However, in his post-trial memorandum on Davidson's authority to represent the corporation, Mr. Slayton argued that, even if corporate formalities were not followed if Mr. Austin were sole director or majority shareholder he had the authority to designate Davidson and others as officers and directors pursuant to the corporate bylaws and had in fact done so, and that such authorization had never been officially withdrawn. The evidence noted above does provide a colorable claim for Mr. Davidson to think himself a director and vice president. In Mr. Slayton's legal memorandum he cited several Oregon cases for the proposition that de facto directors or officers may exist despite the lack of fulfillment of formal requirements and that the corporation itself may authorize someone to perform particular corporate duties even if such duties are not normally part of the "indicia and appurtenances" of that individual's position. Although the cases cited are not directly on point they do provide some legal support for respondents' position. In their appeal brief Mr. Slayton and the other counsel for Mr. Davidson and the corporation also cited case law from Oregon and other jurisdictions and Fletcher on Corporations for the proposition that general rules of agency govern corporate officers' authority. They argued that Mr. Davidson, as a vice president acting in the absence of the president (Mr. Austin), had both the inherent and implied authority to conduct the affairs of the corporation and particularly to resist an improper involuntary petition.

■ The closest case on the facts Mr. Slayton cited to this court is *Regal Cleaners & Dyers v. Merlis*, 274 F. 915 (2d Cir.1921), in which the Second Circuit upheld the corporation's president's answering an involuntary bankruptcy petition in the absence of authorization from the board of directors, who were deadlocked on the question. In so holding, the court said:

If there exists a defense to this petition, while ordinarily it is beyond the authority conferred upon a president of a corpora-

tion to interpose an answer, still circumstances may exist which, in equity, would require him filing an answer, although he has not the authority of a resolution of the board of directors of his corporation. If the company is solvent, for the president not to prevent such a result might cause irremediable injury ... Under these circumstances, we think the president should, in the due performance of the duties of his office, verify and file an answer as such officer. Ordinarily he must make an earnest effort with ... the directors, to induce remedial action on their part ... If he does not make request of the directors, he may show that such a request would be futile.

274 F. at 917. This court, like the court in *Regal,* does look to the equities of a situation. Mr. Slayton and Mr. Muhlheim reasoned that failure to answer the involuntary petition would irremediably place the corporation in bankruptcy, and that it would be futile to request Mr. Austin to contest the petition, if he were the sole director (and president), as petitioners assert. The court does not find this to be a frivolous argument. This is not the extreme type of situation found in *Oil & Gas Co. v. Duryee,* 9 F.3d 771 (9th Cir.1993) where sanctions were awarded when a statutory provision explicitly precluded the company from filing for bankruptcy, a court had specifically ordered the company president not to file, and the attorney had repeatedly ducked the issue of his authority for doing so. Nor does the court find that Mr. Davidson had a conflict of interest arising from the $150,000 transfer which could be identified as a bad faith motive for filing the answer. If the petition were improperly filed because the petitioning creditors were not in fact creditors of the corporation, they would not have been entitled to recover any funds from the corporation, including the $150,000 transferred to Mr. Davidson. Although the legal arguments in favor of Mr. Slayton's position are not strong they are not so baseless as to be frivolous or as to compel the conclusion that they were made for an improper purpose. The court therefore concludes that Mr. Slayton's actions defending against the petition are not sanctionable under Rule 9011.

The petitioners also assert that the following discrete actions by Mr. Slayton provide grounds for sanctions: his motion that the Markusons be required to file a bond; his request for petitioners' personal depositions; his treatment of the Eisenkramer affidavit, his "economy of truth" about statements made by Mr. Davidson and others; his dilatory response to the request for production of documents; and his late production of documents after he had advised petitioners that no more documents could be found.

 When he filed the answer Mr. Slayton requested a petitioners' bond. He said he did so because he had believed the petition was improper and, as the corporation was now dissolved and had no assets, the bond would enable him to recover some attorney's fees. He had done research on the requirements for filing a bond. He also had at this time some evidence that the initial petitioners were not creditors of the corporation. Under 11 U.S.C. § 303(e), the court may require a bond "for cause." The court found insufficient cause for a bond. But this finding was not equivalent to a finding that the bond request was frivolous or made for an improper purpose, and the court does not so find now. Accordingly this court will not impose sanctions for this request.

Mr. Slayton filed an unsigned affidavit of a Jack Eisenkramer in support of his memorandum in opposition to motion to strike answer. Mr. Eisenkramer was a shareholder and investor in the corporation. The memorandum stated that the affidavit was unsigned due to time constraints but that a signed version would be filed with the court by the date of the hearing on the motion to strike. The signed affidavit was still not available at the hearing. Mr. Slayton later testified that he finally received the signed version on January 15 or 16. He said he failed to submit it to the bankruptcy court before the court's decision on the motion on March 22 "for a couple of reasons, none of which I believe were very good." The first reason was that he didn't feel it was relevant after the hearing; the second was that the language in the signed affidavit differed slightly from that in the unsigned version.

He felt that the signed version didn't significantly change the tenor of the affidavit nor the weight of the other evidence.

 Although a court will normally disregard an unsigned affidavit, when an attorney represents to the court that the unsigned affidavit will be followed by an identical signed original the court may rely upon it in reaching its decision. The attorney should know that the court will probably rely on the representation he has made. Under these circumstances the attorney has an affirmative duty to notify the court either that the affidavit has not been signed or submit the signed affidavit, if any, with an indication as to how it differs from that filed but unsigned. Mr. Slayton in fact may not have intended to mislead this court into relying upon the unsigned affidavit. But he took neither steps to withdraw the unsigned affidavit nor to alert the court not to rely upon it. This compares unfavorably with the attorney's conduct in *Arthur Children's Trust v. Godfrey*, 994 F.2d 1390 (9th Cir.1993). There the court declined to award Rule 11 sanctions against an attorney who had filed and relied upon an unsigned affidavit in response to a motion for summary judgment. The Ninth Circuit agreed with the district court that using a misleading affidavit in this manner is an "improper purpose" under Rule 11, and that, although the attorney faced serious distance and time constraints in obtaining a signed affidavit, he should have instead filed a motion for additional discovery time. However, the attorney did attach his own affidavit which explained that the affiant had rejected the unsigned affidavit as inaccurate and that the references to it in the motion papers were inserted before he knew of the affiant's refusal. In the present case, the unsigned affidavit contained assertions regarding Westin's failure to adhere to corporate formalities and Mr. Austin's statement that Mr. Davidson and others would be officers and directors of the corporation. The court might have relied upon these statements and determined that Mr. Davidson was authorized to act for the corporation. In fact the court found otherwise. However, no finding of damages is required for application of sanctions under Rule 9011. Accordingly, sanctions will be awarded for Mr. Slayton's failure to correct his representation to the court regarding the affidavit.

 In their motion petitioners assert Mr. Slayton misrepresented the context and meaning of certain quotations which appear in the supplemental memorandum in opposition to their motion to strike. Specifically they allege that in quoting from his August 6, 1991 letter to the NASD, Mr. Davidson refers to advice given him by his attorney, Mr. Hornecker, on April 15, 1991, (which had suggested that he and the other employees could sign the Memorandum of Understanding and continue to operate the corporation without Mr. Austin), but implied that this was at the same time in May 1991 as other advice given him by Mr. Hornecker (which indicated that he and the other employees could not represent Westin). However, there was no evidence presented to compel the conclusion that the misrepresentation of the date of this conversation was done for an improper purpose. And petitioners' arguments about the correct meaning of these and other statements relating to Mr. Davidson's authority are merely matters of interpretation and emphasis. No sanctions are warranted for this.

 Sanctions are also sought against Mr. Slayton on the grounds that he was dilatory in responding to petitioners' request for production of documents relating to, *inter alia,* his objections to the involuntary petition, and that he exhibited bad faith in producing documents after the January 4, 1993 hearing on the motion to strike after previously indicating there were no more documents to be found. The court does not see how the allegedly *dilatory* response to a request for the production of documents, even one motivated by bad faith, is the type of conduct for which sanctions can be awarded under Rule 9011. This Rule is concerned with whether the serving or filing of pleadings and other signed documents is well-grounded in fact and legally warranted, and is not done for the purpose of delay or harassment. The gravamen of petitioners' accusation here is that the responses should have been served sooner, not that the purpose of their being served at all was to delay

the proceedings. The appropriate vehicle for sanctions for such conduct in the discovery process is Fed.R.Civ.P. 37. Accordingly, no sanctions will be awarded under Rule 9011 for this conduct.

*Mr. Muhlheim:*

■ The only action Mr. Muhlheim participated in prior to the appeal for which sanctions under Rule 9011 could be sought is his filing of the memorandum in opposition to the motion for protective order which the petitioning creditors had filed in response to a discovery request for their depositions. The movants assert this pleading was filed to discourage them from pursuing the involuntary filing. (Oddly, they have not sought sanctions under FRCP 26(g) for making the discovery request itself.) He stated that he filed the memorandum on behalf of the corporation as a courtesy to Mr. Slayton, who was unavailable. The fact that his subjective motive for doing so may have been a desire to accommodate Mr. Slayton does not exempt him from a finding of improper purpose, however, if the motivation behind the seeking of in-person depositions is found to be improper from an objective viewpoint.

■ An attorney has the right to ask for personal depositions. If it objectively appears that there are at least some valid reasons for seeking them the request cannot be said to be sanctionable under either the frivolous or improper purpose prongs of Rule 9011. There are many reasons why in-person depositions, although expensive, are valuable. They allow the attorney to assess the deponent's credibility and potential success as a witness; they provide an opportunity for follow-up questions, and allow the attorney to ask questions about documents which are in hand. Mr. Muhlheim asserted that in-personam depositions were sought because it would cost less to take the petitioners' depositions in Eugene than to prepare requests for production and interrogatories. Further, he asserted that interrogatories and requests for production would not be effective because the newly-added petitioners, who had not been represented by counsel at the time they were served with the notices of deposition, would lack the ability to respond properly and adequately to that form of discovery.

■ The in-person depositions would have required three of the four creditors to travel a little over two hours each way. Representatives of the remaining petitioner, Data Broadcasting, who would have had to travel from California, did not file an objection. This court granted the motion for protective order, finding other discovery methods adequate and less burdensome to the creditors. But this does not necessarily mean that the discovery request was so motivated by improper purpose as to warrant sanctions. Viewed objectively it is possible to conclude that personal depositions were sought to discourage the petitioners from pursuing the involuntary filing. This conclusion is supported by the small amounts of some of the challenged claims, the petitioners' willingness to provide the information sought by sworn statements, as stated in their affidavits filed with the motion for protective order, and the possibility for telephone depositions. In the hearing on the protective order, the court also noted that Mr. Slayton initially had provided the names of the petitioners as potential creditors to the Markusons, and that Mr. Slayton and Mr. Muhlheim had not sought some of the desired information from Mr. Austin, who was available.

On the other hand, Mr. Muhlheim stated that there were questions about the validity of a number of the claims, including whether the petitioners' claims were for services or goods supplied to the debtor or to Mr. Austin's other business entity, Weston [or Westin] Holdings Group. Additionally, the debtor did not request a personal deposition from the American Stock Exchange, located in New York, or from Dow Jones, located in Pittsburgh. The distances the creditors would have been required to travel, while undoubtedly inconvenient to them, were not outrageously burdensome, except for Data Broadcasting, which would have had to come up from California but which did not object to the request for depositions.

Given these conflicting facts the court must conclude that objectively there were some valid reasons why Mr. Muhlheim and

Mr. Slayton could have preferred to use in personam depositions of the petitioners. Therefore the court cannot conclude the request was made for the improper purpose of discouraging them from pursuing the involuntary filing.

*Mr. Davidson:*

As discussed above, this court has found no basis for Rule 9011 sanctions against Mr. Davidson's attorneys, Mr. Slayton and Mr. Muhlheim, except for Mr. Slayton's conduct with regard to the Eisenkramer affidavit. There was no evidence presented that Mr. Davidson was involved in any decisions about the use of the affidavit, so no sanctions can be awarded against him on this basis. Nor does the evidence support sanctions against Mr. Davidson on any other basis, assuming that he would be subject to sanctions as a "party" to the proceedings and not merely a representative of the debtor. Because of the unique facts of this case, Mr. Davidson's status as a party is not clear. *See In re Rainbow Magazine,* 136 B.R. 545 (9th Cir. BAP 1992) (corporate principal who did not sign bankruptcy petition could not be sanctioned for bad faith filing because he was not a party to the proceeding). When Mr. Davidson was served with the involuntary petition, he sought the advice of counsel. Mr. Muhlheim, Mr. Slayton, and the other attorneys they consulted advised him that he had the authority to answer the petition and that there was no conflict prohibiting his doing so. This court has concluded that taking such a position was not legally sanctionable. Mr. Davidson merely followed his attorneys' advice. There was no evidence that he ever attempted to conceal evidence or mislead anyone about the state of affairs in which he found himself. The evidence shows that Mr. Davidson communicated with and cooperated with the NASD and other securities officials, with the Markusons when they were trying to find out what happened to their money, and with state officials and the police. Viewed in light of all the circumstances, Mr. Davidson's conduct in defending against the petition will not support an award of sanctions.

*Ms. Wade:*

Ms. Wade only became involved in the case after the appeal was filed. This court has determined it has no authority to impose sanctions under Rule 9011 for conduct before the court of appeal.

*Mr. Palmer:*

Mr. Palmer's involvement in the case prior to the appeal was minimal. After Mr. Muhlheim had talked to Mr. Davidson he discussed the case with Mr. Palmer and asked Mr. Palmer to assist him in retaining counsel for the corporation. Mr. Palmer then referred Mr. Davidson to Mr. Slayton. Mr. Palmer discussed the case with Mr. Davidson and the other attorneys but he took no active role in the case prior to the appeal. He did no research and prepared no documents prior to the decision to appeal. No documents bear his signature prior to the appeal. There is no basis for sanctions against him under Rule 9011.

This court concludes that sanctions will only be assessed against Mr. Slayton for his conduct regarding the Eisenkramer affidavit. The court believes it is likely the movants incurred no expenses or attorneys' fees because of this conduct. But the court wants to give the movants the opportunity to demonstrate that they have incurred such expenses and fees. Accordingly, the court will allow the movants to file on or before July 14, 1995 a detailed itemization of expenses and fees incurred solely as a result of Mr. Slayton's failure to notify this court that the affidavit he offered had remained unsigned. If the movants do not file such a fee application by that date, the court will sanction Mr. Slayton $150.00 for the violation, to be paid to the moving parties.

This opinion contains the court's findings of fact and conclusions of law and pursuant to Bankruptcy Rule 7052, they will not be separately stated.

An order consistent herewith shall be entered.